| iLOBRANO, Judge.
Anna Turner appeals the trial court judgment which awarded her $10,047.00 in damages against Carrollton Parc Apartments and its insurer, State Farm Fire and Casualty. Her complaint to this court is the insufficiency of the award. For various reasons, discussed infra, she asserts the trial court erred in this regard.1

FACTS AND PROCEDURAL HISTORY:

Anna Turner lived in a two level, two bedroom apartment at the Carrollton Parc Apartments. An interior staircase connected the upper bedroom area with the lower living area and kitchen.
On September 23, 1991, at approximately 6:00 a.m., Turner alleges that as she descended the stairway, she slipped on wet carpet caused by a leaking air conditioner. The accident occurred on the third or fourth step from the bottom of the staircase. Turner landed on the floor on her buttocks with her head striking the stairs. Turner’s sixteen year old daughter, Nikole, heard her mother scream. She immediately came to her aid.
^Turner complained to her daughter of head and neck pain. She was immediately taken to the emergency room at Southern Baptist Hospital where she was seen at 8:15 a.m., treated and released. Thereafter, Turner received various medical treatment, including surgery, from October, 1991 to January, 1995. On July 31, 1992 Turner filed the instant lawsuit.
The trial court awarded Turner $7,500.00 in general damages and $2,547.00 in medical expenses. Turner asserts the following errors in support of her claim that the award is inadequate.
1)The court erred by failing to articulate and consider the effect of the presumption of causation, and as a result there should be a de novo review of damages;
2) The court committed manifest error by failing to find that all of Turner’s injuries were caused by the accident;
3) The court committed manifest error when it failed to award the total amount of medical expenses;
4) The court committed manifest error in not awarding any sum for loss of income (past or future) or for impairment of earning capacity and in failing to admit an income tax return into evidence.
5) The court committed manifest error in its general damage award.
The assignments of error present for our determination the question of whether the presumption of causation set forth in Housley v. Cerise, 579 So.2d 973 (La.1991), on remand, 597 So.2d 71 (La.App. 4th Cir.1992), writ denied, 600 So.2d 646 (La.1992), is applicable to the instant case and thus requiring de novo review of the damage award. If the presumption is inapplicable, we are still required to determine if the award is an abuse of the trial court’s discretion. To resolve these issues, a thorough review of the trial testimony is necessary.
| ¿TESTIMONY ADDUCED AT TRIAL.2

ANNA TURNER:

On direct examination, Anna Turner testified that on the morning of the accident, as she descended the stairs, she slipped on water soaked carpet and fell. Her daughter, Nikole, came to her aid. Nikole helped her to a nearby sofa before calling a taxi to take her to Baptist Hospital. At Baptist Hospital she complained of neck and back pain. X-rays were taken. She was given medication and told to see her doctor.
The first doctor she saw was Dr. William Batherson, a chiropractor. Dr. Batherson was recommended by her attorney. She complained of neck and back pain and tingling in her hands. Dr. Batherson administered heat treatments. She continued her treatment for several months until she got *873pregnant. Because of her back pain she stayed in bed during the pregnancy. After the birth of her child, she returned to Dr. Batherson for treatment. Dr. Batherson eventually recommended she see Dr. Kenneth Vogel who scheduled a lumbar and cervical MRI.
As a result of the MRI, Dr. Vogel performed a cervical neurotomy in May of 1993. In June of 1994, Dr. Vogel performed a lumbar neurotomy. A partial lumbar discec-tomy was also performed.3
Turner testified she also was examined by a Dr. Williams pursuant to an application for social security disability. She stated she was declared disabled.
| .¡Turner admitted that she was involved in an automobile accident subsequent to the fall on the stairs. However, she stated she was not hurt and did not tell her examining physicians.
She testified that prior to the slip and fall, she engaged in many physical activities with her family consisting of baseball, swimming and jogging. Since the fall, she has not been active because of the lower back pain.
She stated she had undergone physical therapy three times per week as directed by Dr. Vogel. She takes a number of medications which cause drowsiness.
Turner testified that for six years prior to the slip and fall accident she worked various jobs for a temporary service. These jobs included receptionist, data processing, PBX operation, typing and word processing. She stated that she earned between $4.50 and $7.00 per hour depending on the job. She testified that she worked for AT & T and Loyola University as well as Boeing. After the fall she was unable to work because she could not sit for long periods of time without severe pain.
Turner also testified that her correct date of birth is September 21, 1952. She admitted lying about her age because she wanted to appear younger.
On cross examination, Turner admitted that she was convicted of forgery on March 29, 1990. Her date of birth shown on documents related to that conviction was November 12,1958.
Turner stated her social security number is 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. However, she admitted giving her daughter’s social security number on her apartment application but said it was a mistake which she corrected. She listed her date of birth on the application as November 2, 1958. Also on this application, she listed |sher mother’s address as her current ad-' dress and stated she earned $2,400.00 per month as a data/operator supervisor. She also gave an incorrect social security number and date of birth for her boyfriend, Paul Berry.
Turner also admitted that on November 7, 1985, she fell down the steps at 1814½ S. • Gayoso Street. This was the home of a friend, Ruby McDonald. She stated she slipped on food on the steps. She subsequently filed a lawsuit claiming she sustained injuries. In that lawsuit she gave her date of birth as September 21,1956.
Turner admitted receiving treatment from the Baptist Hospital Emergency Room on January 30, 1989 for a stiff neck and back, and a sore throat. Those records show Turner listed her brother, Michael Turner as her husband. His U.S. army insurer, Commercial Insurance, was used to apply for treatment benefits for Anna Turner. Another brother’s address was given as her address as well as an incorrect date of birth and social security number. These same discrepancies appear on Baptist emergency records of October 29,1989 when she was treated for facial and hand burns as well as the emergency room records of March 12, 1990 and subsequent records both at Baptist Hospital and Touro Infirmary.
Turner admitted that at her deposition she testified that she saw a Dr. Bacchus and a Dr. Bouligny after the slip and fall. At trial, however, she testified that she only spoke to them over the telephone.

*874
NIKOLE TURNER:

Nikole Turner testified that she is Anna Turner’s eighteen year old daughter. At the time of the slip and fall accident, Nikole lived with her mother, |6younger sister and her mother’s boyfriend, Paul Berry. She stated that on the morning of the accident, she heard her mother scream. She ran to see what happened. She found her mother lying on the floor at the bottom of the staircase with her head resting on the steps. Her mother told her that she slipped on the wet carpet. Her mother appeared slightly dazed and complained of back pain. Nikole stated she telephone for a taxi and escorted her mother to the hospital.
Nikole testified that prior to the accident, her mother never complained of neck or back pain. After the fall, she complained all the time of pain. She was always tired, complained of headaches, was irritable and no longer wanted to engage in any activities with the family.
Nikole admitted that she and her mother were involved in an automobile accident in April, 1992. She testified that their car was struck at an intersection and the left rear area was damaged. She stated she was not injured in the accident and her mother never complained about being injured.
She testified that she first became aware that her mother’s date of birth was September 21st and not November 2nd when she saw her mother’s medical card.
On cross examination, Nikole testified that the police were not notified of the April 22, 1992 automobile accident. She stated that as far as she knew her mother did not go to the hospital or to the doctor and that no lawyer was contacted regarding the automobile accident.
She did admit, however, that her mother was referred to Dr. Vogel sometime after the automobile accident.
|7She testified that Michael Turner is her uncle and that her mother was never married to him. She stated that at the present time, her mother complains more about back pain than neck pain.

PAUL BERRY:

Paul Berry testified that he is Anna Turner’s fiance. He stated he resided with her at the time of the slip and fall accident.
He testified that on the morning of the accident, he returned home from a trip and found no one in the apartment. He discovered the wet steps and water on the floor at the bottom of the staircase. At around 10:00 a.m., he went to the complex office to report the leak. When he returned to the apartment, he found that Anna had returned home. She told him that she had fallen on the wet steps and that she was in pain. He stated that he works for an insurance company and using a company camera he took photos of the damaged ceiling and the wet area on and around the stairs.
Mr. Berry testified that before the fall, Anna Turner did not complain of neck or back pain. After the fall, she would cry at night because of the pain. She was unable to do house work or to engage in any of the family activities that she once did. Long drives in the car also caused her pain because she could not sit in one position for long periods of time. He testified that before the accident Anna Turner worked as a receptionist, secretary and PBX operator for Boeing Petroleum.
On cross examination, Mr. Berry stated that he knew Anna Turner was working when he met her but did not know where. He testified that she did not have a car of her own before the fall. After the fall, he purchased a 1986 or |s1987 Oldsmobile which Anna drove. He stated that she was driving this car when she was involved in the automobile accident in April, 1992. The accident resulted in a dent on the front driver’s side which he did not feel was enough damage to be repaired.
The defense then propounded a number of questions concerning the circumstances surrounding the slip and fall. The questioning then shifted to the subject of Anna’s pain. Presumably referring to Berry’s earlier testimony on' direct, the defense then asked, “I think you testified earlier that since the accident Anna’s had pain, is that correct, since the accident?” Berry responded that she *875complained of pain in her neck, back and arm. The defense then asked, “Has she had any neck pain since this accident?” The response was that her back pain “never let up” from the time of the accident to the surgery. The record is not clear as to which accident the question refers. However, considering the trial court’s reasons for judgment and the context in which the question was asked, it would be reasonable for the court to have concluded that the second reference to “this accident” refers to the auto accident.

DR. WILLIAM BATHERSON:

4

Dr. William Batherson, a chiropractor, testified that he first examined Anna Turner on October 4, 1991, eleven days after her fall. She complained of neck and low back pain, numbness of the hands and fingers and constant headaches. She stated to him that all of these symptoms began after she fell on September 23,1991.
IsDr. Batherson’s examination revealed diminished movement in neck flexion, extension and rotation bilaterally with pain and spasm and tenderness of the left trapezius musculature. The foramina compression test was positive in all three positions. The shoulder compression test was positive on the left side. There was normal movement in the lumbar area with paravertebral muscle spasm and tenderness of the lumbosacral joint. The spasm was moderate to severe. Movement of her arms and legs produced pain.
Dr. Batherson stated that he recommended a treatment program consisting of moist heat, electrical muscle stimulation, ultrasound and range of motion exercises. She was also given a back support. Dr. Bather-son treated plaintiff until August 12, 1992 at which time he recommended that she see Dr. Vogel, a neurosurgeon.
During the treatment period, Dr. Bather-son stated that plaintiff’s symptoms changed with decreased pain in some areas and increased pain and discomfort in others. Plaintiff experienced varying degrees of neck and low back pain radiating to the buttocks; tingling and numbness of the right and left arm and hands; intermittent loss of strength in the left arm; moderate paravertebral spasm in the low back; marked spasm in the left trapezius area; persistent radicular pain in the left upper extremity radiating to the hand with occasional loss of strength; back pain radiating into the legs and stiffness in the neck.
Dr. Batherson’s final diagnosis was a herniated cervical disc and lumbar strain. Dr. Batherson stated that his diagnosis of lumbar strain was ultimately inconsistent with Dr. Vogel’s diagnosis of a herniated lumbar disc.

\ViDR. KENNETH E. VOGEL.

5

Dr. Kenneth E. Vogel, a neurosurgeon, first saw Anna Turner on October 1, 1992. Plaintiff complained of low back and bilateral leg pain, neck and shoulder pain and headaches. An examination of plaintiffs neck revealed severe limitation of motion, severe muscle spasm bilaterally, low neck facet pain, bilateral hypalgesia of the right arm and hand. A lumbar examination revealed moderate limitation of range of motion with severe muscle spasm and hypalgesia of the right lateral foot.
Because of these findings, Dr. Vogel recommended an MRI. The MRI results' showed a herniated lumbar disc which was resolving and a herniated cervical disc with probable cervical instability. A cervical mye-logram CAT scan and a cervical facet arthro-gram were also completed. The CAT scan was negative for herniation with a minimal bulge at the C 4-5 level. The arthrogram was positive at the lower three levels on the right side consistent with cervical instability.
An examination of plaintiff on March 2, 1993 revealed her symptoms were basically unchanged.
Dr. Vogel recommended a cervical neuro-tomy. He described a neurotomy as a procedure which severed all pain to the joints or facets in the neck by using a radio frequency probe to apply heat. This procedure was completed on May 3, 1993. Dr. Vogel stated *876that instability of the spine is caused by injury to the ligaments.
|uHe next saw plaintiff on July 1, 1998. She complained of mild neck and back pain with muscle spasm in both the neck and low back. He recommended she intensify her physical therapy.
On August 12,1993, plaintiff complained of moderate neck and low back pain with left arm pain. Dr. Vogel suggested therapy and a series of epidural blocks.
By January 4, 1994, plaintiffs neck pain and headaches were minimal. However, she complained of increased low back pain and left leg pain. Her cervical examination was normal except for mild limitation of motion. Her lumbar examination revealed mild limitation of motion with flexion limited to 70°; moderate muscle spasm bilaterally; positive straight leg raising test at 70° on the left with lower left facet pain.
Dr. Vogel recommended a lumbar disco-gram CAT scan which was completed on May 5, 1994. The CAT scan revealed a bulge at the L 3-4 level which was asymptomatic; a circumferential bulge at the L5 level which was also asymptomatic and a herniation at the L 4-5 level with pain reproduction consistent with her complaints of lower back and leg pain.
On May 12, 1994, plaintiff was still experiencing low back and bilateral leg pain; intermittent right leg pain; some insomnia; and some weakness of the hands. Dr. Vogel recommended microsurgical discectomy. This procedure was completed on June 27, 1994 at the L 4-5 level bilaterally and at the L 3-4 level on the left side. Dr. Vogel testified that he discovered herniation at three levels with the L 4-5 level causing 90% of plaintiffs pain. In addition to the discec-tomy, Dr. Vogel completed a neurotomy at the L 3-4, L 4-5 and L5-SI levels, bilaterally-
112PIaintiff was next seen by Dr. Vogel on July 26, 1994. She was still experiencing moderate low back and left leg pain with mild spasm, bilaterally. Dr. Vogel recommended that plaintiff begin lumbar rehabilitation exercises.
On September 6, 1994, plaintiff continued to complain of low back and right leg pain with weakness. She also described experiencing spontaneous cervical and right arm pain. She displayed a mild limitation of motion in the neck with muscle spasm on the right; moderate limitation of motion in the lumbar region with moderate spasm bilaterally. Dr. Vogel recommended epidural blocks. He attributed plaintiffs continuing pain to the 10% to 20% abnormality which remained after the surgery. He stated that 80% to 90% of her pain had been resolved by the surgery.
By October 25, 1994, plaintiffs neck pain had resolved. However, she still complained of back pain. Again, Dr. Vogel suggested epidural blocks and therapy.
Dr. Vogel last saw plaintiff on January 12, 1995. At that time her leg pain had resolved and her muscle spasm diminished. She still complained of back pain. She was progressing satisfactorily and he recommended she should continue therapy.
Dr. Vogel’s final diagnosis was cervical instability with a lumbar herniated disc. On direct examination, he testified that he believed plaintiffs problems were caused by the accident of September 23, 1991. On cross examination, however, he admitted that it does not require severe trauma to rupture a disc. A mere sneeze can rupture a disc. He further admitted that plaintiff did not tell him of the auto accident of April, 1992 prior to his examining | igher. He testified that a low impact automobile accident could cause a disc to rupture.
When asked about the cause of plaintiffs problems, Dr. Vogel admitted that his determination of causation depends largely on the patient’s credibility and what the patient relates to him. He also admitted that he did not see plaintiffs x-rays taken at the emergency room at Baptist Hospital.
DR. DANIEL H. JOHNSON, JR:6
Dr. Johnson, a radiologist, testified that he examined the results of plaintiffs cervical and lumbar spine MRIs.
*877The MRI results revealed an abnormality of the back side of the C 3-4 disc showing a right central posterior herniation. Levels C 4-5 and 5-6 also appeared abnormal but there was no evidence of herniation. There was anterior marginal spurring, ligamentous thickening and disc bulging at the C 5-6 and C 6-7 levels.
Dr. Johnson testified that Dr. Rubin Chrestman another radiologist examined the lumbar MRI results. Dr. Chrestman’s report shows dehydration of the discs at the L 3-4 and L 4-5 levels. The lumbosacral disc was slightly dehydrated as well. Dr. Johnson described dehydration as symptomatic of a change in the internal architecture of the disc either due to herniation or other factors. Dr. Chrestman found a one millimeter posterior bulge at the L 3^ level which was not particularly impressive and which showed no herniation. He found definite herniation at the L 4 — 5 level which was more prominent on the right side.
InOn cross examination, Dr. Johnson testified that there was no evidence of nerve root impingement at the C 3^4, 4-5 or 5-6 levels nor at the L 3-4 level. He described the L 4-5 disc as abutting the undersurface of the nerve root but could not document nerve root impingement. He was unable to give an opinion as to what caused these abnormalities or if they pre-dated the September 23, 1991 accident.

DR. RICHARD W. LEVY:

Dr. Richard W. Levy, a neurosurgeon, examined plaintiff on September 23, 1993 on behalf of State Farm. He found her lumbar and cervical regions normal except for mild restriction of the neck with diffuse tenderness in both areas. He found no atrophy in her arms, hands or calf muscles. The power in her arms and legs was normal as well as her reflexes. Dr. Levy testified that in his opinion, plaintiff did not have a herniated disc in either the lumbar or cervical spine and found no reason for any neurosurgical treatment. He stated that her x-rays revealed large beak-like osteophyte at the C 5-6 level which, because of their size, had to have pre-dated the September 23, 1991 accident. X-rays taken two years later on September 27, 1993, show identical abnormalities. Dr. Levy opined that the September 23, 1991 x-rays show a pre-existing arthritic condition that could have been accelerated by • a fall under certain circumstances. However, he testified that this would be less probable than more probable. Dr. Levy found no evidence of compression of any nerve root or nerve structure.
| isDR. MARCEL A BACCHUS:7
Dr. Marcel A. Bacchus, an obstetrician, testified that he began treating Turner in January, 1991 for various gynecological complaints. As of March 14, 1991, Turner was not pregnant. On January 6, 1992, Dr. Bacchus diagnosed Turner as seven weeks pregnant. This pregnancy resulted in a normal birth on July 30,1992.
Subsequent to this birth, Dr. Bacchus’ records show Turner had several other pregnancies which she terminated. On January 20, 1993, Turner requested that Dr. Bacchus clear her for orthopedic surgery. She apparently had an abortion and needed clearance. Dr. Bacchus told her that only the doctor that performed the abortion could clear her for surgery.
Dr. Bacchus testified that his records reflect that it was not until March, 1993 that Turner first complained of neck and back problems. Prior to this time, no complaints of this kind were expressed and no special precautions were taken during her pregnancy for any neck or back problems.

NATHANIEL E. FENTRESS:

Nathaniel E. Fentress, a rehabilitation counselor testified that he conducted a vocational rehabilitation evaluation of Anna Turner on August 16, 1994. He stated he reviewed her medical records and administered a vocational, intelligence and achievement test. Her intelligence test score was 92 which placed her in the lower range of the average IQ of the general population which means she is of average intelligence. Her achievement test results show her functioning at a sixth grade level in reading, spelling and arithmetic.
*8781 ^Plaintiff told Mr. Fentress that she was forty-two years old and had graduated from high school with college credits from Delgado and the National Education School. She told him she worked at Loyola University as a receptionist/secretary from 1976 to 1982. After 1982 she stated that she did temporary work as a receptionist, word processor and other clerical jobs. Other temporary work consisted of display work and food service at the Convention Center.
Mr. Fentress opined that plaintiff would be restricted to jobs that did not aggravate her back condition. He determined that some of the work she did in the past she would not be able to do now. The jobs available to her would fall in the minimum wage range of $4.25 per hour to $6.00 per hour. Her records indicate her earning capacity fell within this range up to $7.00 per hour.
On cross examination, Mr. Fentress stated that he did not review any employment records except plaintiffs social security records which showed the following gross earnings:
1983 $ 680.00
1984 2,060.80
1985 605.48
1986 6,621.73
1987 6,621.26
1988 1,505.91
1989 4,557.65
1990 235.50
1991 0
1992 1,540.56
Mr. Fentress testified that plaintiff told him that she was born on September 21,1952 and graduated from high school in 1974 which would have been at 22 years of age. Plaintiff also told Fentress she attended Howard University as an accounting major and earned a 3.4 grade point average. However, no records were given him from any educational institution plaintiff liyclaims to have attended. Mr. Fentress also admitted that plaintiff provided no tax returns to verify income and that the $7.50 per hour wage figure was provided by plaintiff.

DR. MELVILLE WOLFSON:

Dr. Melville Wolfson, an economist, testified that he calculated Anna Turner’s lost earnings. He based his calculations on a wage of $7.25 per hour to age 60 using adjustments for age and reduced salary for a total of $218,490.00. Using a wage of $4.24 per hour, the total lost earnings equals $91,-491.00.
On cross examination, Dr. Wolfson admitted the $7.25 per hour wage was given to him by plaintiff. No corroborating documentation was used. Plaintiff did not provide any tax returns, wage records or social security earnings history. He also admitted that he did not know if plaintiff worked between the accident and trial.

PRESUMPTION OF CAUSATION:

Turner asserts that the trial court committed manifest error in failing to articulate and consider the effect of the presumption of causation, and, as a result, this Court should conduct a de novo review of damages. In support of her argument, plaintiff cites, Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La. 2/20/95), 650 So.2d 757 and Housley v. Cerise, supra.
“The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.” Maranto v. Goodyear Tire & Rubber, 94-2603, p. 3, 650 So.2d at 759. | igPlaintiffs burden of proving causation is aided, however, by the presumption recognized in Housley v. Cerise, supra. Housley holds that a plaintiffs disability is presumed to have resulted from an accident if (1) the plaintiff was in good health before the accident, (2) commencing with the accident, the injury and symptoms continuously manifest themselves afterwards and (3) the medical evidence shows a reasonable con-nexity between the accident and the injury, id. at 980. If the presumption exists, a defendant may defeat it by showing some other particular incident could have caused the injury in question. Maranto, supra at 761.8
*879In the instant ease, two factors operate to defeat the presumption of causation. The first, and most significant factor, is the subsequent automobile accident of April, 1992. It was not until after this accident' that Turner sought neurological treatment which resulted in various surgical procedures. Dr. Vogel testified that it was not until January, 1994 that Turner complained of increased lower back and leg pain which ultimately necessitated the microsurgical discectomy on June 27, 1994. Dr. Vogel stated that Turner never told him of the subsequent automobile accident. In fact, she told him that she had not sustained any other fall or injury which could have caused the pain. Dr. Vogel candidly admitted the automobile accident could have caused her lower back problems.
The second factor is plaintiffs credibility. The trial court undoubtedly found serious credibility problems in plaintiffs testimony.9 Although her [ ^credibility taints the entirety of her testimony, we find it particularly relevant as it pertains to the medical connexity of the accident and her injuries. The opinion of Dr. Vogel as to causation is suspect because of plaintiffs failure to give him a complete history of previous accidents. On cross-examination Dr. Vogel admitted that his opinion was based on the information provided by plaintiff. Because of plaintiffs lack of candor, the trial court rejected Dr. Vogel’s assessment of the cause of her injuries. We see no error in this credibility determination as it is supported by the record. Given the questionable basis upon which Dr. Vogel’s causation opinion is predicated, plaintiff has failed to prove the medical connexity necessary to be entitled to the presumptive aid of Housey.

REVIEW OF DAMAGES:

Without the aid of a presumption of causation, our review of the trial court judgment is limited to the issue of whether or not the trial court abused its much discretion in the award of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In this particular case, however, the question is not really whether the award is inadequate in relation to the injuries, but whether the trial court was manifestly erroneous in his finding of lack of causation. In that regard we are guided by the rules of appellate review enunciated in Stobart v. State Through DOTD, 617 So.2d 880 (La.1993), Rosell v. ESCO, 549 So.2d 840 (La.1989), on remand, 558 So.2d 1360 (La.App. 4th Cir.1990), writ denied, 561 So.2d 105 (La.1990), and Dominici v. Wal-Mart Stores, Inc., 606 So.2d 555 (La.App. 4th Cir.1992).
In the instant case, the trial judge was faced with two permissible views of the evidence concerning the extent of the injuries plaintiff sustained as a |2oresult of her fall on September 23, 1991. It is apparent that the court, after hearing that evidence, concluded that the injuries she sustained in that fall were those treated by her chiropractor, Dr. Batherson. The court rejected plaintiffs claim that the subsequent surgeries and treatment by Dr. Vogel were causally related to the September 23, 1991 accident. After reviewing the evidence and giving due deference to the fact finder’s conclusions, for the following reasons, we cannot say those conclusions are clearly wrong.
Turner bore the burden of proving through objective documentation and evidence, not only the existence of her injuries, but also a causal connection between all of them and the September 23, 1991 accident. It was incumbent upon Turner to prove that it was more probable than not that all of her subsequent medical treatment was necessitated by the slip and fall.
The problem with Turner’s case is her own credibility. While the trial court found that it was more probable than not that Turner slipped and fell on the wet carpet, it dismissed most of her claims for subsequent injuries because of her lack of credibility and because the objective medical evidence did not show there was a reasonable possibility *880of a causal connection with the slip and fall accident. Except for her initial visits to Dr. Batherson, all of the treatment and surgery for her neck and back occurred after the subsequent automobile accident of April, 1992.
Of crucial importance to resolving this case is the fact that Turner gave conflicting testimony on a variety of facts. In particular she was impeached with respect to her prior conviction for forgery, her age and date of birth, her correct address, her name, her correct social security number, her education, occupation and work status, her marital status, her income and whether she had 12ibeen previously involved in other accidents and/or treated for other injuries. She also gave conflicting testimony about a previous lawsuit. Medical records from Southern Baptist Hospital, Drs. Batherson, Levy and Vogel showed Turner changed her age and date of birth by as many as six years. Some of her medical records listed her brother, Michael Turner, as her husband for purposes of obtaining insurance benefits. Turner also used her daughter’s social security number on her apartment lease and gave her income as over $2,000.00 per month.
Dr. Batherson treated plaintiff from October, 1991 to December, 1991. All of her tests were normal, yet she continued to complain of back and leg pain. In addition, she told Dr. Batherson that she had delivered a child just three days prior to her first office visit. That was untrue. Dr. Batherson again saw Turner once in January and once in March, 1992. He did not see her again until August,. 1992 four days after she did deliver a child. After that visit she was referred to Dr. Vo-gel. She did not tell him of the April automobile accident.
During her treatment with Dr. Batherson, Turner was also treated by Dr. Bacchus, her obstetrician, for a pregnancy which resulted in the birth of her child on July 30, 1992. Dr. Bacchus testified that Turner’s pregnancy was uneventful. Turner never complained to him of any neck or back problems until March 23, 1993, two years after her slip and fall accident. In addition, Turner did not tell Dr. Bacchus of the automobile accident of April, 1992, even though she was six months pregnant at the time. Dr. Vogel testified that Turner’s complaints of left leg pain and increased lower back pain were relayed to him on January 4, 1994. He described the leg pain as “spontaneous in onset”. Turner told Dr. Vogel that no intervening fall or injury had occurred. In fact, in August, 1993, Dr. Vogel discharged Turner following her cervical surgery.
122Pr. Vogel testified that his opinion was affected to the extent that the information he was given was correct. He also testified that he never reviewed Turner’s x-rays taken after the slip and fall which Dr. Levy testified were normal. Dr. Levy did testify that he found pre-existing “osteophyte” in the cervical area.
Dr. Daniel H. Johnson, Jr. testified that he never examined Turner or reviewed any other medical records. He found no evidence of any root impingement on two MRIs he took on August 12, 1992 and November 10, 1992. He further testified that he had no knowledge of when Turner’s L 3-4 herniated disc occurred or how long any abnormalities in Turner’s cervical or lumbar spine were present.
Turner’s claims for lost wages, past and future, and lost earning capacity are equally not supported by the record and suffer from similar conflicting testimony. A claim of lost wages need not be proven with mathematical certainty but only requires such proof as reasonably establishes the claim. This may consist of a plaintiffs own testimony. However, to allow a plaintiff to recover damages for lost wages in the absence of independent support is highly speculative. McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993).
In the instant case, plaintiff failed to provide any independent support or objective facts to corroborate her claims in this regard. Both Mr. Fentress and Dr. Wolfson testified that their figures were based on information given to them by plaintiff. The only objective documentation presented at trial was Turner’s social security earnings history for the years 1983 through 1992. These records show Turner earning no more than approximately $6,600.00 in annual income. In 1990, *881the year before the accident, Turner earned $235.50.
|23At trial, Turner attempted to introduce into evidence a copy of a tax return for 1990 showing income of $8,515.00. The copy was not certified and no W-2 forms were presented to corroborate the return. Plaintiff asserts that pursuant to Louisiana Code of Evidence Articles 803(6) and 901(B), the tax return should have been admitted. Plaintiff argues she laid the necessary foundation pursuant to these rules of evidence when she identified the return and authenticated its validity. In denying admission of the return, the Court stated:
1 have a problem, because the information given to Mr. Fentress show that in 1990 the earnings were $235.50.
[[Image here]]
... Seems to me you should have written to IRS and asked them for a copy. But I’m not going to accept this, based upon the information Mr. Fentress had. No W-
2 forms. Everybody’s given copies of their W-2 forms.
You can proffer it.10
Code of Evidence Article 803(6) provides that records of regularly conducted business activity are admissible “unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness”. The trial court expressed concern about the genuineness of the return because it conflicted with the social security records provided to Mr. Fentress which indicate considerably less income earned. Given the question of Turner’s overall credibility as expressed by the trial court, we find no error in refusing to admit the return, nor do we find any clear error in the court’s failure to award damages for lost wages or earning capacity.
[^Furthermore, based on the record before us we cannot say the award of $7,500.00 for general damages is so low as to constitute an abuse of the trial court’s much discretion.
For the reasons stated above, there was no error in awarding damages to plaintiff for the period of time she was treated by Dr. Bath-erson. The rejection of her claims for subsequent treatment is supported by the record.
AFFIRMED.

. Defendants did not appeal, thus liability is no longer at issue.

. James Washington, Paul Fuller, Dorothy Cohn and Shirley Jackson, employees of Carrollton Parc at the time of the alleged accident, also testified at trial. Their testimony addressed the issue of liability. Since liability is not an issue on appeal, their testimony, although reviewed, will not be discussed.

. Our review of the medical testimony, infra, provides the specific dates of Turner’s various visits and treatments.

. Dr. Batherson testified via sworn deposition of January 17, 1995.

. Dr. Vogel testified via sworn deposition of March 14, 1995.

. Dr. Johnson testified via sworn deposition of January 18, 1995.

. Dr. Bacchus testified via sworn deposition of March 9, 1995.

. Plaintiff cites Johnson v. Louisiana, 95-0003 (La.App. 1st Cir. 10/6/95) 671 So.2d 454 for the rule that if the plaintiff is entitled to the presumption and the court fails to apply it, legal error results requiring a de novo review of the entire record to determine causation. This opin*879ion is unpublished. As such, it is of no prece-dential value. See, Uniform Rules, Courts of Appeal, 2-16.3.

. In his reasons for judgment the trial court specifically found that “the credibility of the plaintiff was successfully impeached by the defendants.”

. The return was proffered as "Plaintiff's Proffer 29”.